IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GO COMPUTER, INC., et al. | * | |
| | * | MDL 00-1332 |
| v. | * | Civil No. JFM-05-2413 |
| | * | |
| MICROSOFT CORPORATION | * | |
| | ***** | |

OPINION

GO Computers, Inc. and Jerrold Kaplan (collectively "GO"or "New GO") have instituted this action against Microsoft Corporation for violation of federal antitrust laws.[1] The action was initially filed in the United States District Court for the Northern District of California and was transferred here by the Judicial Panel on Multidistrict Litigation. Microsoft has filed a motion to dismiss or for summary judgment on the ground that GO's claims are barred by limitations. GO opposes the motion on three grounds: (1) its claims did not accrue until April 2005 because Microsoft fraudulently concealed its wrongdoing; (2) the statute of limitations was tolled until all appeals in the action instituted by the United States against Microsoft in 1998 were finally resolved; and (3) Microsoft has been guilty of continuing antitrust violations that have injured Lucent Technologies, Inc. ("Lucent"), a successor to the original GO Corporation, in the current market.

Microsoft's motion will be treated as one for summary judgment and, as such, will be granted. However, as set forth in section IV of this Opinion, my ruling is without prejudice to GO instituting a new action asserting federal antitrust claims for injuries allegedly suffered by

---

[1] GO has filed a parallel action in the Superior Court for the City and County of San Francisco alleging violations of California state law. They assert that the federal action is only a "protective suit", and have asked me to stay all proceedings pending completion of the California action. GO has offered no good reason for this request, and it is denied.

Lucent within the four years preceding the filing of any such new action.[2]

I.

In 1987, Plaintiff Jerrold Kaplan founded GO Corporation ("Old GO") to develop and market a computer and operating system based on the use of a pen-like stylus. First Amended Complaint ("FAC") ¶ 10. Old GO created a small personal computer similar to a notebook computer, and an operating system called "PenPoint" designed for use with these computers. *Id*. With the PenPoint operating system, a user could hold the computer in one hand and write on its flat screen directly. *Id*. Old GO then contacted major software developers, including Microsoft, to encourage them to write new applications designed to run with PenPoint. *Id*.

After learning about the PenPoint operating system, Microsoft allegedly embarked on the course of conduct at issue in this case. According to GO's first amended complaint, "Microsoft undertook to 'kill' GO." FAC ¶ 12. Microsoft allegedly engaged in illegal conduct to discourage investors such as Intel from investing in Old GO, misappropriate the PenPoint technology, prevent Old GO from receiving releases of software designed to integrate PenPoint with Microsoft's software products, and other anticompetitive conduct. *Id*. ¶¶ 13-22. Microsoft also allegedly used "incentives and threats" to prevent major computer manufacturers like Compaq, Fujitsu, and Toshiba from making pen computers using Old GO's technology, leaving them to use the technology Microsoft had misappropriated from Old GO instead. *Id*. ¶¶ 22-25. Finally, Microsoft allegedly used the same tactics to prevent similar companies from using Old

---

[2]As also set forth in Section IV of this Opinion, I am striking all allegations in the Amended Complaint underlying the claims asserted by GO in the Amended Complaint concerning Lucent's own alleged antitrust injuries in light of the fact that no such claims had been assigned by Lucent to GO when the Amended Complaint was filed.

GO's pen computer operating system, PenPoint. *Id*. ¶ 26.

After Microsoft's allegedly violative conduct took its toll, Old GO sold its assets to EO, Inc. ("EO") in January 1994 in a non-cash merger for EO stock. *Id*. ¶ 28. EO continued Old GO's PenPoint development work for a short period after the merger, but abandoned the project in July 1994, allegedly because "Microsoft had by then substantially closed the [original equipment manufacturer ("OEM")] channel to any operating system competitor."[3] *Id*. GO's complaint is unclear as to whether EO continued to exist after suspending PenPoint work in 1994, see FAC ¶ 28, but Microsoft's motion to dismiss states that "EO was shut down" at that time. Mot. to Dismiss at 3. GO states that EO was formally dissolved in 1997, at which time Lucent Technologies, Inc. ("Lucent") acquired EO and all of its assets. FAC ¶ 3.

In 2002, Kaplan was deposed in a separate private antitrust suit against Microsoft, at which time he alleges that he gained new information, "first learn[ing] of Microsoft's secret combination with companies as [*sic*] Intel, Compaq, and Toshiba to exclude GO from the PC operating system market." Opp'n at 6. Subsequently, Kaplan incorporated a second GO corporation, named "GO Computer, Inc." ("New GO"), and New GO acquired claims that had been transferred to Lucent as part of the 1997 asset sale by purchasing them from Lucent in April 2005. *Id*. at 7. New GO filed this suit on June 29, 2005.

II.

An action to enforce the federal antitrust laws is barred unless it is commenced within a

---

[3] Although further development of the PenPoint technology was abandoned in 1994, GO alleges that licensing efforts for the pen technology continued and that products based on it were successfully marketed through 2002. *Id*. ¶ 29. In addition, GO points out that there are still currently existing corporate users of PenPoint and pen technology, and various OEMs continue to provide support for those products. *Id*.

four-year period after its accrual. 15 U.S.C. § 15B.  Generally, the four-year period begins when the injurious act is committed.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 572 (4th Cir. 1976) (same).  However, what is known as the fraudulent concealment doctrine has developed in order to prevent a defendant from secreting its wrongdoing until any claim arising out of it would be time-barred, thereby protecting itself from suit.  *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995).  Under that doctrine the limitations period for concealed fraud claims starts when the plaintiff discovers the fraud rather than when it is committed.  *Id.*  A plaintiff in an antitrust case must plead three elements to invoke the fraudulent concealment doctrine: "1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and 2) the plaintiff failed to discover those facts within the statutory period, despite 3) the exercise of due diligence."  *Id.* (citing *Weinberger v. Retail Credit Co.*, 498 F.2d 552, 555 (4th Cir. 1974)).[4]

Factual disputes concerning the extent of a plaintiff's knowledge cannot be resolved on summary judgment.  *See, e.g.*, *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999).  However, where the facts establishing its knowledge are not in genuine dispute, the accrual date of its cause of action is determinable as a matter of law.  *See, e.g.*, *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993); *Pocahontas Supreme Coal*

---

[4]As an initial matter, a claim made by GO that the statutory period should not start until it acquired from Lucent the claims it is asserting is erroneous.  If (contrary to what I am holding) the fraudulent concealment doctrine did apply, limitations would start to run when Kaplan learned of the factual basis for GO's claims, not when GO actually acquired those claims.  *Weinberger*, 498 F.2d at 555.  GO's submissions clearly assert that Kaplan first became aware of the facts underlying GO's antitrust claims during his 2002 deposition.  Opp'n at 13.

*Co. v. Bethlehem Steel Co.*, 828 F.2d 211, 218 (4th Cir. 1987); *Brown v. Am. Broad. Co.*, 704 F.2d 1296, 1304 (4th Cir. 1983).

In order to be put on inquiry notice, it is not necessary that a party have full knowledge of all the facts giving rise to his claim. *Brumbaugh*, 985 F.2d 162 ("Inquiry notice is triggered by evidence of the *possibility* of fraud, not by complete exposure of the alleged scam.") (emphasis added). Although "[m]ere rumors are insufficient to establish notice," *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C. Cir. 1984), a party must initiate an inquiry if he is aware of "'red flags' signaling a cause of action," *id*. at 40.

Here, a declaration submitted by Kaplan in response to Microsoft's motion demonstrates there were many "red flags" of which Kaplan was aware. Further, the declaration establishes that, rather than being ignorant of grounds upon which it could have sued Microsoft, GO made business and strategic decisions not to pursue legal action. For example, it is undisputed that GO had notice of its trade secrets claim. After seeing a Microsoft presentation of Pen Windows, Kaplan states that as of March 1991, GO's concerns about potential misappropriation of GO technology "were sufficient . . . that we contacted a law firm specializing in intellectual property issues," who suggested that GO "had a *prima facie* case for misuse of GO intellectual property." Kaplan Decl. ¶ 11. Kaplan states that for various reasons, including "PenPoint's momentum in the marketplace, and the potential cost and distraction of a legal battle", he recommended that GO not sue Microsoft at that time. *Id*. ¶ 13.

In addition, in his declaration Kaplan admits that he had suspicions about Microsoft's licensing practices and that these suspicions "played a role in [GO's] business planning." *Id*. ¶ 18. Although Kaplan goes on to aver that his suspicions "did not rise to the level of justifying an

5

antitrust action," they were not speculative but based upon specific information.  Kaplan signed a separate personal declaration in response to a Federal Trade Commission ("FTC") subpoena that explained that GO "had heard from one potential Windows licensee that Microsoft had proposed a per-processor license and suspected that another had an exclusive licensing agreement."  *Id*. ¶ 19.  Kaplan also acknowledges in his declaration that a book he wrote, that was completed in late 1994, implied that "Microsoft may have engaged in [questionable business tactics] in competing with GO."  *Id*. ¶ 24.

GO attempts to blunt the effect of Kaplan's knowledge by arguing that it was reasonable for Kaplan to rely on Bill Gates's repeated representations that Microsoft had not engaged in untoward conduct.  However, such representations do not themselves provide a valid basis for failing to conduct a reasonable inquiry into alleged wrongdoing.  *See Pocahontas*, 828 F.2d at 218-19  (refusing to find fraudulent concealment "on no more than an alleged failure to own up to illegal conduct"); *Bausch v. Philatelic Leasing, Ltd.*, No. 93-1685, 1994 WL 446758, at *5 (4th Cir. Aug. 19, 1994) (agreeing with the trial court's assertion that "[w]hen the person acting on behalf of those under suspicion denies any problem, that denial does not operate to conceal the notice provided to the plaintiffs by the government's charges").  Moreover, Kaplan has testified on deposition that even after Gates's denials, he refused to meet with Microsoft because they were a "bunch of thieves".  Kaplan Dep. at 719 (cited in Reply at 18).  This testimony alone negates GO's reliance argument; no reasonable person would take the word of someone he believes to be dishonest.

GO also seeks to justify its failure to investigate its possible claims against Microsoft on the basis of a decision made by the FTC in 1992, after it had engaged in a preliminary

investigation, not to pursue regulatory action against Microsoft.  Kaplan states in his declaration that although the FTC's lead investigator initially told him the agency's investigation did not deal with Microsoft's actions towards GO, Kaplan Decl. ¶ 16, the FTC later asked him for a declaration dealing specifically with Microsoft and GO, *id*. ¶ 19.  Thus, according to Kaplan, when the FTC announced that investigators had studied Microsoft's business practices and had found nothing of concern, he "interpreted this to mean that [his] concerns about Microsoft's business practices were unfounded."  *Id*. ¶ 20.

      This contention is flawed.  A plaintiff cannot simply wait until others have investigated a defendant's conduct and then choose to bring suit relying on the fraudulent concealment doctrine.  In *Brumbaugh*, the Fourth Circuit held that "[m]erely bringing suit after the scheme has been laid bare through the efforts of others . . . will not satisfy the requirements of due diligence when there have been prior warnings that something was amiss."  985 F.2d at 162.  In this case the record is clear that GO did have "prior warnings that something was amiss."  Indeed, Kaplan's declaration submitted to the FTC itself evidenced such warnings.  GO's in-house counsel prepared a chronology for the FTC that detailed pressure by Microsoft on developers not to work with GO.  Moreover, Kaplan states in his book that an FTC economist told him "[t]his looks like a textbook case of abuse of monopoly power."  S. Jerrold Kaplan, *Startup* 184 (1994).  In *Startup*, Kaplan also relates a conversation he had with an executive from a Korean company called Trigem before meeting with the FTC.  *Id*. at 180.  In that conversation, the executive explained that Microsoft was tying its product to Intel products in a way that amounted to per-processor licensing.  *Id*.  Kaplan writes that as of that conversation (which, again, was prior to his meeting with the FTC), "suddenly everything fell into place."  *Id*.

For these reasons, I find on the basis of Kaplan's own statements that GO had sufficient knowledge in 1992 to require it to investigate whether it had viable antitrust claims against Microsoft. Assuming, however, that GO's knowledge was not sufficient in 1992 to trigger its duty of diligent inquiry, unquestionably that duty was triggered in 1994 when the United States filed a complaint against Microsoft and a consent decree was simultaneously entered in that proceeding. That consent decree required Microsoft to cease the use of per-processor licensing agreements. This obviously should have put GO on notice that Microsoft had in fact been using such agreements, and GO should have investigated whether it had an antitrust cause of action at that time.

### III.

GO next argues that its claims are not time-barred because under section 5(i) of the Clayton Act, 15 U.S.C. § 16(i), limitations were tolled during the period from May 1998, when *United States v. Microsoft*, No. 98-1232 (D.D.C.) was instituted, until June 30, 2004, when all appeals in that proceeding were finally resolved. In response, Microsoft argues that: (1) GO's claims are not "based in whole or in part on" the matters litigated in *United States v. Microsoft*, one of the requirements for section 5(i) tolling; (2) section 5(i) tolling never came into play because GO's claims were time-barred long before *United States v. Microsoft* was filed; and (3) GO failed to file this suit within a year of the entry of the consent decree in *United States v. Microsoft* as required by section 5(i).

### A.

Section 5(i) applies only where a private action is "based in whole or in part" on the

8

matters litigated in the government's antitrust suit. 15 U.S.C. § 16(i). In general, the congruence of the respective claims is determined by considering the allegations as they appear on the face of the two complaints. *Leh v. Gen'l Petroleum Corp.*, 382 U.S. 54, 65 (1966). I have recently addressed the nexus required between a private complaint and a government complaint for section 5(i) tolling purposes in *Novell v. Microsoft*, No. 05-1087, 2005 WL 1398643 (D. Md. June 10, 2005). As I explained in my memorandum opinion in that case: "[t]he governing test is whether the matters complained of in the private action 'bear a real relation' to a matter complained of in the government suit." *Id*. at *3.

Microsoft argues that the *United States v. Microsoft* complaint was based on different conduct occurring during a different time period than the conduct involved in the present action. In *Novell*, I refused to apply section 5(i) tolling to Novell's claims relating to the word processing and spreadsheet markets because the government action was focused on operating systems and internet browsers. *Id*. at *4. Likewise, here I find that section 5(i) tolling does not apply to the claims asserted by GO about its pen computer because these claims relate to conduct within a separate market. Where *United States v. Microsoft* was based on the operating system and internet browser markets, GO's pen computer claims are based on the development and marketing of computer hardware or, more specifically, on pen computer technology.

However, GO's complaint also alleges antitrust violations with regard to its PenPoint operating system. The complaint in *United States v. Microsoft* alleged similar violations with regard to other operating systems. Therefore, Microsoft's argument about the difference in time periods involved in the two actions becomes pertinent. GO alleges anticompetitive conduct that occurred primarily before Old GO folded in 1994. The conduct complained of in *United States*

9

*v. Microsoft* occurred from May 1995 through the filing of the complaint in May of 1998.

Microsoft contends that this time difference is dispositive, citing *Peto v. Madison Square Garden Corp.*, 384 F.2d 682 (2d Cir. 1967). There, the court found that section 5(i) tolling did not apply where the conspiracies alleged in the government and private actions covered different time periods. The absence of temporal overlap was, however, only one of the factors weighing against tolling in *Peto*; the allegations in the government action and the private suit referred to "different sports activities" and the conspiracies alleged were "entirely different." *Id*. at 683. As the court explained, "the only similarity between the two actions is found in the fact that some of the defendants are the same." *Id*.

Here, in contrast, there is an identity of the defendants named, and there is also an identity of the marketplace identified and the anticompetitive conduct alleged. Therefore, as to GO's PenPoint operating system claims, *Peto* is not controlling. Rather, I find this aspect of the case to be governed by *Leh*, where the Supreme Court found that differences in the scope of time, even coupled with the exclusion of several defendants named in the private suit from those named in the federal suit, was not sufficient to bar section 5(i) tolling. *Leh*, 382 U.S. at 62. However, for the reasons stated in the following two subsections of this Opinion, I nevertheless find that section 5(i) tolling does not save GO's operating system claims from being time-barred.

B.

As stated in section II, I find that GO's claims had accrued by 1992. Because the four-year limitations statute had thus expired when *United States v. Microsoft* was filed in 1998, section 5(i) tolling cannot save any of GO's claims, including its operating system claims. If,

however, the alternative conclusion I reached in section II - that GO's claims accrued when the complaint and consent decree in the 1994 action brought by the United States against Microsoft were filed - Section 5(i) tolling does apply because those filings were made in July 1994, less than four years before May 1998, when *United States v. Microsoft* was instituted.

C.

Section 5(i) suspends the statute of limitations during the pendency of an antitrust action instituted by the United States and for one year thereafter.  15 U.S.C. § 16(i).  Therefore, assuming that GO's operating system claims had not expired before *United States v. Microsoft* was instituted, the next question is whether GO instituted this action within one year after the "pendency" of *United States v. Microsoft.*

In *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1363 (5th Cir. 1976), the Fifth Circuit held that for purposes of section 5(i) tolling, a government action that is terminated by a consent decree "concludes" when the consent decree is entered, not when the time to appeal from the decree has expired.  Subsequent cases have followed the *Yoder Bros.* rule.  *See, e.g.*, *Shimazaki Comm., Inc. v. Am. Tel. & Tel. Co.*, 647 F. Supp. 10, 12-14 (S.D.N.Y. 1986); *Keystone Res., Inc. v. Am. Tel. & Tel. Co.*, 646 F. Supp. 1355, 1359-60 (W.D. Pa. 1986); *see also* 1 American Bar Association, *Antitrust Law Developments*, 899 (5th ed. 2002).  The consent decree in *United States v. Microsoft* was entered on November 12, 2002.  This action was filed more than one year later, on June 29, 2005.

GO argues that the tolling period stopped not on November 12, 2002, but on June 30, 2004, when the United States Court of Appeals for the District of Columbia affirmed the entry of the consent decree.  According to GO, the *Yoder Bros.* rule does not apply because (1) the

11

consent decree in *United States v. Microsoft* was entered after heavily contested litigation, and (2) the entry of the consent decree was itself litigated on appeal. The distinctions GO draws are not persuasive. Both *Shimazaki* and *Keystone* involved consent decrees that were not entered until after seven years of pretrial litigation and near the end of trial in a Department of Justice suit against AT&T. Similarly, in both cases intervenors appealed the consent decree to the United States Supreme Court, and there were subsequent proceedings in the district court itself to approve a plan of reorganization. The existence of these proceedings did not dissuade the courts presiding over subsequent private litigation to apply the *Yoder Bros.* rule in determining when section 5(i) tolling ceased.

Likewise, there is no reason not to apply the *Yoder Bros.* rule here. It has the substantial benefit of preventing chaos and instilling consistency in the commencing of statutory periods. Moreover, once the consent decree was entered, a legal regimen was clearly established upon which private litigants could reasonably rely in asserting any claims for antitrust injuries they allegedly sustained as a result of Microsoft's conduct covered by the decree.[5]

IV.

GO's final contention is that its claims are not time-barred because Microsoft continued to commit federal antitrust violations within four years of the filing of this suit. Where a continuing violation of antitrust laws occurs, "each overt act that is part of the violation and that

---

[5] Indeed, many plaintiffs brought private actions in the immediate wake of the findings of fact and conclusions of law made by Judge Jackson in *United States v. Microsoft*, 87 F. Supp. 2d 30 (D.D.C. 2000). This MDL proceeding was created in 2000 as a result of these lawsuits. Although, at first, most of the cases were instituted by consumers, numerous Microsoft competitors brought suit after the D.C. Circuit had reviewed Judge Jackson's findings, see *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), and well before the one-year period following the entry of the consent decree had expired.

injures the plaintiff . . . starts the statutory period running again." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal citations omitted). The plaintiff may then recover for injuries suffered after the overt act, if the injuries occur within the statutory period prior to the date the complaint was filed. *See, e.g.*, *Zenith*, 401 U.S. at 338 (explaining that for a continuing violation, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act"); *Charlotte Telecasters*, 546 F.2d at 572 (explaining that "each refusal to deal gives rise to a claim under the antitrust laws" and that "the statute of limitations commences to run from the last overt act causing injury to the plaintiff's business").

It is undisputed that Old GO and EO, which had purchased Old GO's assets, were no longer in business and could not have suffered any antitrust injury as a result of Microsoft's alleged continuing antitrust violations, a necessary component to any viable claim. *See e.g.*, *Lantec, Inc. v. Novell, Inc.*, 146 F. Supp. 2d 1140, 1154 (D. Utah 2001) (where a plaintiff had effectively exited the market and was no longer a potential competitor, plaintiff could no longer suffer antitrust damages). Therefore, in order to invoke the continuing violation doctrine, New GO and Kaplan, the plaintiffs in this action, must assert claims for injuries that Lucent Technologies, the successor to Old GO and EO, allegedly suffered as a result of Microsoft's alleged continuing anticompetitive conduct. I find that New GO and Kaplan may not assert Lucent's direct claims because when the Amended Complaint was filed they could not allege in good faith, as they did, that those claims had been assigned to them.

A.

GO's right (that is, New GO and Kaplan's right) to assert any claims in this action is based upon three assignments they obtained from Lucent. In pertinent part, the first assignment, made in April 2005, states:

> To the extent that Lucent . . . acquired from AT&T any legal interest in any federal and state anti-trust claims . . . that AT&T had previously acquired from GO Corporation . . . against Microsoft . . . LUCENT hereby assigns the claims to GO Computer, Inc., a Washington Corporation, and S. Jerrold Kaplan.

This language unquestionably encompasses only Old GO's claims because it refers only to "claims . . . that AT&T had previously acquired from GO Corporation."

The second assignment was made in February 2006. It provided in pertinent part:

> To the extent that Lucent . . . possesses any legal interest in any claims acquired directly or indirectly from GO Corporation, . . . based on MICROSOFT's violations of Federal or California antitrust laws resulting in harm to GO Corporation or to GO Corporation's successors and assignees (including Lucent), Lucent hereby assigns said claims.

This assignment was made after the amended complaint in this action had been filed and Microsoft's motion to dismiss or for summary judgment had been fully briefed. GO's counsel apparently recognized that there were deficiencies in the first assignment, particularly one stemming from the fact that the first assignment referred to the transfer of claims that Lucent had "acquired from AT&T" when, in fact, AT&T had never itself owned any of the claims in question. What is important for present purposes, however, is that the second assignment, like the first assignment, did not encompass any antitrust claims that Lucent had against Microsoft in its own right as a competitor of Microsoft. Although the insertion of the word "indirectly" in the second assignment may have solved the AT&T issue, it did not broaden the claims being assigned beyond those that had been "acquired . . . from GO Corporation."

Again, GO's counsel apparently recognized the inadequacy of the February 2006 assignment when they prepared for the hearing on Microsoft's motion to dismiss or for summary judgment. They therefore obtained a third assignment from Lucent. Unlike the first two assignments, the last assignment does appear to cover claims for injuries allegedly caused by Microsoft not only to Old GO but also to Old GO's successors (including Lucent). It provides:

> To the extent that Lucent . . . possesses any legal interest in any claims against Microsoft . . . based on MICROSOFT's violations of Federal or California antitrust laws resulting in the harm to [Old GO] . . . or to GO CORPORATION's successors and assignees (including LUCENT) (the "CLAIMS"), LUCENT hereby assigns said claims .
> . . .

Inexplicably, the third assignment was undated, and GO's counsel produced and referred to it for the first time at the hearing on Microsoft's motion to dismiss or for summary judgment. At the conclusion of the hearing, because of the suspicious provenance of the third assignment and its belated production, I requested supplemental briefing on the issue of whether GO and its counsel should be required to pay the fees of Microsoft's attorneys and a compensatory payment into the registry of the court as a sanction for not disclosing, prior to the hearing, information that clearly bore upon the arguments to be made and considered at the hearing. The briefing has been completed, and I am satisfied that the imposition of the sanction I contemplated is not warranted. Although the allegations in the amended complaint certainly could and should have been more precise, they were sufficient to put Microsoft (and the court) on notice that GO was asserting claims for injuries alleged to have been caused to Old Go's successors by Microsoft's alleged antitrust violations.

That said, the post-trial briefing - during which for the first time GO produced and disclosed the terms of the first two assignments - also made crystal clear that although GO did

assert claims in the amended complaint for injuries suffered by Old GO's successors, including Lucent, there was no factual basis for the allegations supporting those claims. As set forth above, the first two assignments made by Lucent to GO by their plain terms encompassed only those claims that had been acquired by Lucent from Old GO. Nevertheless, in preparing their response to a motion to dismiss or for summary judgment filed by Microsoft as to the original complaint, GO's counsel sought to cure the deficiencies in their arguments on the limitations issues, particularly the continuing violation argument, by adding allegations that GO was asserting claims on behalf of its successors.

Several facts, specifically the absence of allegations concerning the terms of the first two assignments in the amended complaint, plaintiffs' failure to produce those assignments until ordered by the court to do so, the last-minute presentation of the third assignment during the course of oral argument, and the omission of a signing date in the third assignment, draw into question the subjective good faith of GO's counsel. I need not, however, make any finding on that point. Rather, I will assume that when filing the amended complaint, GO's counsel did not engage in intentional deception but simply ignored the fact that their client had not been assigned the Lucent claims they were asserting on its behalf.

Perhaps it is no longer uncommon for lawyers to make convenient allegations as support for a legal theory they espouse and to wait for the facts to catch up with their allegations, if and when the lack of foundational support for the allegations is uncovered. But however routine that practice has become, it is entirely inconsistent with the mandate of Fed. R. Civ. P. 11(b)(3), which provides that when filing a pleading, an attorney certifies that "to the best of . . . [his] knowledge, information and belief, formed after an inquiry reasonable under the circumstances,

the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."

It is against this background that I have decided to strike all the allegations in the amended complaint underlying the claims asserted by GO for any injury allegedly suffered by Lucent itself as a competitor of Microsoft.[6]  This sanction is moderate and, in accordance with the directive of Rule 11(c)(2), is sufficient to deter repetition of the filing of factually unsubstantiated allegations by GO's counsel and others comparably situated.  It has a bite because its effect is to deprive GO of the benefit of its continuing violation argument based upon injury allegedly suffered by Lucent within four years of the institution of this action.  At the same time, the sanction is not unfairly broad because it permits GO to file a new action asserting any federal antitrust claims it believes are viable on the basis of antitrust injuries suffered by Lucent within the four years preceding the filing of a new action.  In order to assure that my intent in this regard is clear, the order of dismissal I am entering herewith expressly provides that the dismissal is without prejudice as to claims based upon antitrust injuries suffered by Lucent

---

[6]As indicated above, at the conclusion of the hearing on Microsoft's motion to dismiss or for summary judgment, I asked the parties to submit supplemental briefing on the question of whether GO and its counsel should be required to pay the fees of Microsoft's counsel and to make a compensatory payment to the court for costs incurred in preparing for the hearing without knowledge of the third assignment.  I did not, however, advise GO that I was considering imposing the sanction of striking allegations in the amended complaint underlying the claims GO was asserting on behalf of Lucent.  Accordingly, in accordance with the directive of Rule 11(c) that a court should provide a party with notice and a reasonable opportunity to respond before imposing a sanction, GO may move for a reconsideration of this order on or before July 21, 2006, if it wishes to challenge my order striking the Lucent allegations.

itself.[7]

A separate order effecting the rulings made in this Opinion is being entered herewith.

Date:  June 29, 2006              /s/
                                  J. Frederick Motz
                                  United States District Judge

---

[7] I recognize that rather than dismissing the action, I could grant leave to GO to file a second amended complaint containing allegations based upon the third assignment as received from Lucent.  At first blush this approach might seem to be mandated by the well-established general rule that an assignment of claims may be made at any time before trial.  *See, e.g.*, *Dubuque Stone Prod. Co. v. Fred L. Gray Co.*, 356 F.2d 718, 724 (8th Cir. 1966); *Kilbourne v. Western Sur. Co.*, 187 F.2d 567, 571 (10th Cir. 1951); *see also* Fed. R. Civ. P. 17(a) (prescribing leniency in the real party in interest rule); 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1545 (2d ed. 1990) (explaining the application of the real party in interest rule to assignments).  Following that approach here, however, would have the effect of rewarding GO for having filed its first amended complaint in violation of Rule 11.  Presumably, what claims GO might assert in the second amended complaint would be deemed to relate back to the original complaint.  With relation back, by means of the continuing violation theory, GO would be able to circumvent the statutory period by asserting claims for injuries suffered by Lucent during the four years dating back from the original complaint rather than from the second amended complaint.  Thus, far more on point than the cases just cited following the general rule, is *United States ex rel. Wulff v. CMA, Inc.*, 890 F.2d 1070, 1074-75 (9th Cir. 1989), where the court refused to allow an amendment based upon a belated assignment because the effect of the amendment would have been to resuscitate a claim barred by the limitations provision of the Miller Act.  *See also* Fed. R. Civ. P. 17(a) advisory committee's note (noting that Rule 17(a)'s leniency "should not be misunderstood or distorted", and is "intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made.").